UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                          :
ANGELITA RIVERA                           :            3:17-CV-01726 (RMS)
                                          :
V.                                        :
                                          :
NANCY A. BERRYHILL,                       :
ACTING COMMISSIONER OF                    :
SOCIAL SECURITY[1]                        :            DATE: DECEMBER 12, 2018
                                          :
------------------------------------------------------ x

RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"]

denying the plaintiff's application for Supplemental Security Income ["SSI"] and Social Security

Disability Insurance ["SSDI"] benefits.

I.      ADMINISTRATIVE PROCEEDINGS

On or about March 27, 2014, the plaintiff filed applications for SSI and SSDI benefits,

claiming that she has been disabled since February 1, 2009, due to depression, anxiety, extreme

fatigue, hepatitis C, and human immunodeficiency virus ["HIV"].   (Certified Transcript of

Administrative Proceedings, dated January 9, 2018 ["Tr."] 283; see Tr. 103–104, 147, 151, and

160).  The plaintiff's applications were denied initially and upon reconsideration. (Tr. 23, 90–102,

103–15, 118–31, 132–45).   On January 7, 2015, the plaintiff requested a hearing before an

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. The Federal
Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. § 3349(b); accordingly,
as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the
duties and functions not reserved to the Commissioner of Social Security.

Administrative Law Judge ["ALJ"] (Tr. 23, 165; *see also* 20 C.F.R. §§ 404.929, *et seq.* and 416.1929, *et seq.*), and on February 27, 2016, a hearing was held before ALJ Louis Bonsangue, at which the plaintiff and a vocational expert, Renee Jubrey,[2] testified. (Tr. 20–35; *see* Tr. 50–87). On June 2, 2016, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 20–35). On June 20, 2016, the plaintiff requested review of the hearing decision (Tr. 242–43), and on August 10, 2017, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–3).

On October 12, 2017, the plaintiff filed her complaint in this pending action (Doc. No. 1), and on February 20, 2018, the defendant filed her answer and certified administrative transcript, dated January 9, 2018. (Doc. No. 13). On February 27, 2018, this case was transferred to United States Magistrate Judge Joan G. Margolis, following the parties' consent to a Magistrate Judge. (Doc. No. 16). On April 19, 2018, the plaintiff filed the pending Motion to Reverse the Decision of the Commissioner, with brief in support (Doc. Nos. 17, 17-1 ["Pl.'s Mem."]), along with a Joint Statement of Material Facts. (Doc. No. 17-2). On May 1, 2018, the case was transferred to this Magistrate Judge (Doc. No. 18), and on June 18, 2018, the defendant filed her Motion to Affirm the Decision of the Commissioner, with brief in support. (Doc. Nos. 19, 19-1 ["Def.'s Mem."]).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 17) is DENIED, and the defendant's Motion to Affirm (Doc. No. 19) is GRANTED.

---

[2] The hearing took place in Hartford, Connecticut, where the ALJ and the plaintiff appeared in person. The vocational expert, Ms. Jubrey, appeared via telephone. (*See* Tr. 50). The plaintiff had no objection to Ms. Jubrey's qualifications to testify as a vocational expert.

II.    FACTUAL BACKGROUND

As of her alleged onset date of disability, February 1, 2009, the plaintiff was forty-four years old.  (*See* Tr. 90).  The plaintiff lives alone in an apartment and has lived alone for approximately seven years.  (Tr. 62).  The plaintiff has two adult children, a son and a daughter, as well as one grandson.  (Tr. 62, 75).  The plaintiff has a ninth grade education and does not have a driver's license; she took a driver's test, but failed.  (Tr. 63).  She does not "have patience" for public transportation because she "feel[s] awkward being around a lot of people."  (Tr. 63–64).  The plaintiff's friend typically drives the plaintiff wherever she has to go.  (*See* Tr. 63, 76).

The plaintiff has a history of heavy drug use; however, she testified at the hearing that she has not used drugs since 1997.  (Tr. 71–72).  The plaintiff was incarcerated for a period of time during the 1980s at the York Correctional Institution in Niantic, Connecticut.  (*See* Tr. 66, 67; *see also* Tr. 84).  While she was incarcerated, the plaintiff took classes and obtained a certification in business.  (Tr. 66).  The plaintiff attempted to get her GED, but her "anger took the best side of [her]," and she was unable to complete the program.  (Tr. 66).  She sees her therapist weekly for her anxiety and depression, which she testified developed after she was molested at age seven or eight.  (Tr. 72).  According to the plaintiff, her depression has gotten worse since she has been sober.  (Tr. 72).

A.    ACTIVITIES OF DAILY LIVING

The plaintiff watches television every day, including one-hour shows, and is able to tell others about what occurred on the show that she just watched.  (Tr. 76, 82).  When watching an hour-long television show, however, the plaintiff gets up several times to "drink water" or "use the bathroom."  (Tr. 76).  The plaintiff uses the bathroom frequently throughout the day, as her hepatitis C medication causes diarrhea.  (Tr. 68–69, 292).  The plaintiff also enjoys reading, but at

times has trouble understanding big words. (Tr. 82). One of the plaintiff's hobbies is cleaning her apartment. (Tr. 82–83). The plaintiff cleans her apartment at least once a week and whenever she thinks it needs to be cleaned. (Tr. 83–84, 294). There are some days, though, when the plaintiff's aches and pains make it difficult to do chores. (Tr. 83–84, 294). When this happens, the plaintiff "suck[s] it up" and cleans. (Tr. 83–84). On days when the plaintiff is "no good," her friend will help her with household chores. (Tr. 79). The plaintiff manages her own finances (Tr. 293), showers, and brushes her teeth most days (Tr. 290); however, on occasion, she has a "bad day" and does not get out of bed or shower. (Tr. 79).

Although the plaintiff does not like to cook, she cooks for herself multiple times per week and often prepares home-cooked meals such as soup, rice and beans, and pork shoulder. (Tr. 82; *see* Tr. 291). The plaintiff has trouble following recipes, however, because she "tend[s] to forget them." (Tr. 82). There are also days when the plaintiff's friend will cook for her (*see* Tr. 79) and, on particularly bad days when she cannot get out of bed, her friend will feed her. (Tr. 80). Moreover, the plaintiff's friend does most of her grocery and clothes shopping because the plaintiff has trouble being around people. (Tr. 64). The plaintiff testified that there are times when she "just can't be around people" and that she feels as though others are "out to get her," so she does not have the "patience" to go to the store. (Tr. 64). When she does go to the store, which is about once per month, she "want[s] to hurry up and get it done," and expects the employees to "hurry up and take care of [her] so [she] can go." (Tr. 65).

The plaintiff often cares for her five year old grandson, whom she sees nearly every day. (Tr. 75). When the plaintiff is with her grandson, she plays with, and reads to, him. (Tr. 75). The plaintiff testified that her grandson is her "pride and joy" and the only person who makes her happy. (Tr. 77). There are many times when the plaintiff will keep her grandson at her apartment

for an entire day and, when her grandson has a three-day weekend from school, she will keep him for the entire weekend. (Tr. 78). The plaintiff explained that it is hard for her to care for her grandson and that, when her pain flares up, she calls her daughter to get him. (Tr. 78). The plaintiff's friend also assists the plaintiff when her grandson spends the night at the plaintiff's apartment and when he needs to be picked up from school. (*See* Tr. 75, 78).

The plaintiff experiences pain in her daily activities; the pain begins after she has been sitting or standing for approximately two to three hours. (Tr. 81). When the plaintiff stands for an extended period of time, her feet become swollen. (Tr. 297). The plaintiff can walk about two blocks before she needs to stop and rest (Tr. 295); she has to rest for about thirty minutes before she can continue walking again. (Tr. 295). Even when she experiences pain, the plaintiff "forces [her]self" to walk; however, there are days when the plaintiff is unable to make it up and down stairs. (Tr. 81). She can leave the house on her own, but does not go outside often because she does not "feel too good physically." (Tr. 294). The plaintiff can pay attention until she "feel[s] bored," but does not always finish what she starts. (Tr. 295). She has trouble getting along with family members, friends, and neighbors because she does not like socializing (Tr. 296), and she struggles with authority figures because she feels as though they are "talking about [her]." (Tr. 295).

The vocational expert testified that the plaintiff's past relevant work as a "package sealer, machine" and "houseworker, general" were medium exertional jobs with an SVP[3] of two and three respectively. (Tr. 56). The ALJ posed a hypothetical to the vocational expert about an individual

---

[3] The Dictionary of Occupational Titles "lists a specific vocational preparation (SVP) time for each described occupation." Social Security Ruling 00-4p, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000). "Using the skill level definitions in 20 C.F.R. [§§] 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the [Dictionary of Occupational Titles]." *Id.*

who was limited to medium exertional work; simple, routine, repetitive tasks with no production-rate pace; little or no contact with co-workers and no requirement for collaborative efforts; no public contact; and few changes in the work routine from day-to-day. (Tr. 57). The vocational expert testified that this hypothetical person would be unable to perform the plaintiff's past relevant work, but that jobs existed in significant numbers in the national economy that this person would be able to perform. (Tr. 57–58). The ALJ then added the limitation that this hypothetical person would "occasionally not respond appropriately to any criticism from supervisors," and the vocational expert opined that "there would be no job for that [individual]." (Tr. 58–59).

The ALJ then asked the vocational expert to opine whether jobs existed for a hypothetical individual with the same limitations; however, limited to light exertional work. (Tr. 59). The vocational expert testified that this individual would be able to perform the jobs of a "mail clerk," a "marker," and a "rooming clerk" (Tr. 59–60), and that these jobs existed in significant numbers in the national economy. Again, however, when the ALJ added the limitation that the individual would "occasionally not respond appropriately to any criticism from supervisors," the vocational expert opined that there would be no jobs for the individual. (Tr. 60).

B.    MEDICAL RECORDS[4]

1.    DR. ZIFE KROSI

The record reflects the plaintiff's extensive treatment history at Staywell Health Care, Inc. ["SHC"]. Dr. Zife Krosi evaluated the plaintiff initially on June 3, 2009, when the plaintiff complained of back pain and right knee pain. (Tr. 466–68). A physical examination of the plaintiff's musculoskeletal system revealed that she had "[f]ull range of motion of the knees[,] [n]o

---

[4] The following recitation is largely drawn from the parties thorough Joint Statement of Facts. (*See* Doc. No. 17-2). Commonly used medical terms do not appear in quotation marks, but are taken directly from the plaintiff's medical records.

crepitus, full ROM, ligaments intact, [and] no tendonitis." (Tr. 468). Dr. Krosi recommended that the plaintiff treat her knee pain with "ice, rest, and Ibuprofen." (Tr. 468). A psychological review revealed that the plaintiff was depressed because she had "no family around"; however, she denied the need for prescription antidepressants and declined a referral to a mental health provider. (Tr. 466).

On December 17, 2009, the plaintiff complained of pain in her left hip. (Tr. 453). A physical examination of the plaintiff's hips showed "full range of motion" and "normal mobility," but tight muscles in her left hip. (Tr. 454). Also on this date, Dr. Krosi noted that the plaintiff was resuming interferon treatment for her hepatitis C.[5] (Tr. 453). On March 18, 2010, however, the plaintiff reported to Dr. Krosi that she was "very disappointed because her treatment for hepatitis C failed to suppress the virus" (Tr. 449) and that she "sometimes" experienced pain in her knees. (Tr. 449). On July 26, 2010, the plaintiff complained of left hip pain that was "on and off," which she believed was related to an incident that occurred when she was younger and under the influence of drugs. (Tr. 435). The plaintiff complained also of pain in the right side of her lower back. (Tr. 436). A physical examination of the plaintiff showed that she had full range of motion in her lumbosacral spine (Tr. 437); a neurological examination was unremarkable. (Tr. 437). An MRI on August 19, 2010, revealed "[m]oderate spondylotic changes [at] L2-L3 level with a moderate dextroscoliosis at L2." (Tr. 352).

On December 2, 2010, Dr. Krosi evaluated the plaintiff and noted that she reported in her "usual state of good health." (Tr. 432). The plaintiff complained of menopause symptoms, but

---

[5] The plaintiff received treatment for hepatitis C at Yale New Haven Hospital ["YNHH"]. (*See* Tr. 506–35; *see also* Tr. 794–97). Records from YNHH reveal that, as of May 2012, the plaintiff had stage two liver fibrosis. (*See* Tr. 527). After December 2012, the plaintiff did not return to YNHH for hepatitis C treatment until July 2014, at which time the plaintiff reported that she felt "well overall" and had no "new liver-specific complaints." (Tr. 507). The records indicate also that, between December 2012 and July 2014, the plaintiff either "no showed" or cancelled her scheduled appointments. (Tr. 507).

also reported that her quality of life has "greatly improved" since she stopped her hepatitis C treatment. (Tr. 432). The plaintiff did not report any musculoskeletal symptoms, and Dr. Krosi noted that her gait and stance were normal. (Tr. 433–34). On April 13, 2010, the plaintiff reported "achy and stiff joints" in the mornings, as well as sometimes "feeling poorly (malaise)," which Dr. Krosi concluded was most likely related to her hepatitis C. (Tr. 428). The plaintiff rated her pain as a five out of ten. (Tr. 429). On February 22, 2012, the plaintiff explained to Dr. Krosi that she had "pain in her bones," but felt "well overall except for insomnia [that] she attributes to feeling anxious about her 26 year old daughter and the way she is caring for her baby." (Tr. 424). Additionally, the plaintiff agreed to meet with a mental health provider "to sort through her feelings and anger which stresses her." (Tr. 424). A physical examination revealed that the plaintiff's gait and stance were normal. (Tr. 426).

On August 9, 2012, the plaintiff stated to Dr. Krosi that "she can't work because of many health issues: arthralgias, fatigue, body aches" (Tr. 417); Dr. Krosi noted "musculoskeletal symptoms" under the section titled "history of present illness." (Tr. 417). A physical examination of the plaintiff's musculoskeletal system showed that the plaintiff had "[f]ull range of motion of the knees bilaterally, no swelling, [and] no effusion" (Tr. 419); a neurological examination revealed that the plaintiff's gait and stance were normal. (Tr. 419). On October 18, 2012, the plaintiff reported to Dr. Krosi that, over the preceding two weeks, she had experienced three instances of "loss of pleasure," no instances of "loss of interest in activities," and six instances of "feeling down or hopeless." (Tr. 405). An examination of the plaintiff was unremarkable. (Tr. 405–408).

On January 31, 2013, a review of the plaintiff's musculoskeletal system showed that the plaintiff had muscle and joint aches. (Tr. 398). A psychological review revealed "[a]nxiety mild,

depression mild, and sleep disturbances . . . ." (Tr. 398). On October 2, 2013, Dr. Krosi noted that the plaintiff did not have any pain. (Tr. 383). On February 20, 2014, the plaintiff complained to Dr. Krosi of "achy bones" (Tr. 371, 780) and stated that it was "difficult for her to stand too long or sit for too long." (Tr. 371, 780). The plaintiff stated also that her joints ached and that she was "too tired to work." (Tr. 371, 780). A review of the plaintiff's musculoskeletal system revealed joint pain in the legs and back, and muscle aches. (Tr. 372, 781). Dr. Krosi concluded that the joint pain could be related to the plaintiff's hepatitis C (Tr. 373, 782); she also referred the plaintiff for mental health counseling. (Tr. 373). On May 5, 2014, Dr. Krosi evaluated the plaintiff, who complained again of "body aches" (Tr. 365, 773), but noted that she was "otherwise good."[6] (Tr. 365, 773). The plaintiff stated also that she was "doing much better" after seeing a therapist and a psychiatrist. (Tr. 365, 773, 775). Dr. Krosi did not make any objective findings related to the plaintiff's musculoskeletal system or "body aches"; however, she noted that the plaintiff's gait and stance were normal. (Tr. 367, 775).

On August 6, 2014, the plaintiff complained to Dr. Krosi that she had "body aches, joint pains and fatigue when [she] exerts herself" (Tr. 761), and as a result, she has been unable to hold a job. (Tr. 763). Following a physical examination of the plaintiff, Dr. Krosi noted that the plaintiff's pain was "possibly related to hepatitis C," and/or "fibromyalgia."[7] (Tr. 763). An examination of the plaintiff on November 10, 2014, revealed that there was "[n]o localized joint

---

[6] Shortly before this date, on April 27, 2014, the plaintiff presented to the emergency department at Waterbury Hospital, complaining of lumbar pain that was "onset 2 days ago and chronic." (Tr. 847). The plaintiff described the pain as moderate, sharp pain, which was exacerbated by "movement, standing, walking, sitting and changing position." (Tr. 847). A physical examination of the plaintiff's musculoskeletal system revealed "normal inspection, full [range of motion]"; the plaintiff was diagnosed with sciatica and chronic back pain. (Tr. 849).

[7] Dr. Krosi also completed a form entitled "Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection." (Tr. 536–40). On this form, she noted that the plaintiff suffered from depression as a result of her HIV and that she exhibited "marked limitation in maintaining social functioning" and "marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." (Tr. 538).

pain," and "[n]o anxiety, no depression, and no sleep disturbances." (Tr. 745). On July 20, 2015, the plaintiff complained of lower back pain, specifically, "[r]adicular pain, posterior aspect of lower extremities." (Tr. 717). Dr. Krosi did not note any objective findings regarding the plaintiff's musculoskeletal system or her complaints of radicular pain; however, she noted that the plaintiff's gait and stance were normal. (Tr. 719–20). On September 16, 2015, Dr. Krosi referred the plaintiff for an x-ray of her left knee, which showed "mild degenerative arthritis." (Tr. 591). On September 17, 2015, the plaintiff stated to Dr. Krosi that she had been experiencing left knee pain for two to three weeks and that, following physical therapy, her lower back pain was beginning to improve. (Tr. 710). Dr. Krosi diagnosed the plaintiff with "arthralgia of the [left] knee/patella/tibia/fibula," and referred her to physical therapy. (Tr. 712).

## 2. DR. JOHN BATTISTA AND SUSAN MURRAY

The plaintiff underwent extensive treatment with Dr. John Battista and counselor Susan Murray, M.A., LPC, LADC, at SHC beginning in April 2014. (*See* Tr. 502). On June 18, 2014, Dr. Battista and Ms. Murray completed a report for SSA regarding the plaintiff's mental health condition. (*See* Tr. 502–505). They indicated that the plaintiff suffered from major depressive disorder, posttraumatic stress disorder, opioid dependence, and cocaine dependence. (Tr. 502). They noted also that the plaintiff's condition was "improved" and that she was able to manage her activities of daily living. (Tr. 502). Under the section titled "General appearance," they indicated that the plaintiff was "isolative, self critical, [and] irritable" (Tr. 502); under "Cognitive status," they found that the plaintiff had "intrusive memories, difficulty with attention and concentration, [and] obsessive checking." (Tr. 502). They stated in the report that the plaintiff had "No Problem" with the following: "taking care of her personal hygiene"; "caring for her physical needs (i.e. dressing and eating)"; "using good judgment regarding safety and dangerous circumstances";

"carrying out single-step instructions"; "carrying out multi-step instructions"; or "changing from one simple task to another." (Tr. 503–504). They noted that the plaintiff had "A Slight Problem" with the following: "focusing long enough to finish assigned simple activities or tasks"; and "performing basic work activities at a reasonable pace/finishing on time." (Tr. 504). They indicated, however, that the plaintiff had "An Obvious Problem" with: "[u]sing appropriate coping skills to meet ordinary demands of a work environment"; "interacting appropriately with others in a work environment"; "asking questions or requesting assistance"; and "performing work activity in a sustained basis (i.e., 8 hrs per day, 5 days a week)." (Tr. 503). Lastly, they noted that the plaintiff had "A Serious Problem" with: "[h]andling frustration appropriately"; "respecting/responding appropriately to others in authority"; and "getting along with others without distracting them or exhibiting behavioral extremes." (Tr. 503–504). The report commented that the plaintiff had "anger and rage with frustration," "anger and rage/inability to communicate effectively," and "concentration issues." (Tr. 503–504).

Dr. Battista completed a "progress note" on October 8, 2014, in which he explained that the plaintiff "[d]escribe[d] multiple episodes of depression on and off for years" (Tr. 754), and that, at the time, the plaintiff had felt depressed for at least some portion of each day for two years. (Tr. 754). The plaintiff also explained that she was "[f]earful that people don't want to be around her," "[m]ore socially withdrawn," "[l]acks interest," and had "[n]o sexual interest." (Tr. 754). Dr. Battista noted that the plaintiff had been gaining weight even though her appetite was poor, which he believed was due to a lack of exercise. (Tr. 754). In addition, the plaintiff told Dr. Battista that she had trouble falling asleep because she "can't turn her mind off at night." (Tr. 754). The plaintiff indicated also that she cried "without reason," her "[c]ognition [was] impaired," and that she "[s]ometimes heard people calling her name." (Tr. 754). Dr. Battista also

included in the progress note that the plaintiff had "[s]elf critical thoughts" and that she got "angry easily," which was "an exacerbation of a life-long history of irritability." (Tr. 754). Dr. Battista added that the plaintiff "associate[d] her anger with being sexually molested" when she was seven years old, and that the plaintiff ha[d] intrusive memories about this still." (Tr. 754). He opined that the plaintiff "[m]eets criteria for PTSD," that her "symptoms are currently more active than in the past," and that she meets the criteria for "Major Depression, recurrent with psychotic features." (Tr. 754). Dr. Battista explained that the plaintiff "[h]as some checking that does interfere with getting out of [the] house," but that he would not "diagnose [her] with OCD at this point." (Tr. 754). On October 8, 2014, Dr. Battista noted that the plaintiff was "[i]mproving week over week." (Tr. 755).

On October 15, 2014 and November 7, 2014, Dr. Battista noted that certain medication that the plaintiff was taking made the plaintiff feel more irritable. (Tr. 750, 753). On October 29, 2014, Ms. Murray noted that the plaintiff had made "No Progress" over a ninety-day period and that the plaintiff had been "non-compliant with [the] attendance policy and is [at] risk for discharge from Behavioral Health." (Tr. 765 (emphasis omitted)). On November 7, 2014, Dr. Battista indicated that the plaintiff's depression was "generally well controlled" (Tr. 750), but that the plaintiff was "still socially inhibited." (Tr. 750).

On April 2, 2015, the plaintiff underwent a ninety-day treatment plan review, which detailed the problems that treatment sought to address. Dr. Battista and Ms. Murray indicated that the plaintiff experienced "[d]epression, crying, anger, agitation and irritability daily," and that she continued "to have issues when it comes to her adult daughter," but was "much better with her partner." (Tr. 819). They indicated that the plaintiff experienced "[i]ntrusive thoughts, memories and dreams of past trauma," although "her medications seem to have alleviated most symptoms."

(Tr. 819). The plaintiff's self-esteem was "poor but improved." (Tr. 819). Dr. Battista and Ms. Murray noted additionally that the plaintiff had a "[h]istory of chronic severe illness requiring close medical monitoring," and that her "compliance issues" were "addressed and improved slightly." (Tr. 819). They noted "[g]ood clinical improvement," and explained that the plaintiff would continue to see Ms. Murray "weekly for 52 weeks or less, with progress evaluated every 90 days." (Tr. 819).

On July 8, 2015, Dr. Battista completed a "progress note," which summarized the plaintiff's progress over five months. Dr. Battista indicated that the plaintiff's depression "comes and goes," and that, at times, she is irritable, moody, and short-tempered. (Tr. 723). Dr. Battista noted that, as of June 3, 2015, the plaintiff was taking sertraline, which was making her less anxious and less irritable;[8] he noted also that the plaintiff's depression was "under better control." (Tr. 723).

On July 29, 2015, Dr. Battista and Ms. Murray completed a document titled "Medical Report." (Tr. 541–50). On the report, Dr. Battista and Ms. Murray indicated that the plaintiff suffered from posttraumatic stress disorder and major depressive disorder, and that the combination of conditions prevented the plaintiff from working for twelve months or more. (Tr. 543). They detailed the following impacts on the plaintiff's ability to work: "depression, anxiety, irritability, agoraphobic, difficulty interacting without anger, difficulty interpersonally with men," and that "physical illness limits psychiatric medication intervention, concentration and social interactions on the job would be poor [and] problematic." (Tr. 543). Dr. Battista and Ms. Murray noted also that the plaintiff's mental health and/or substance abuse issues impacted her ability to work because of "intrusive memories related to childhood sexual abuse," as well as "anger,

---

[8] On July 8, 2015, however, the plaintiff stated that her HIV medication was making her "more irritable." (Tr. 723).

irritability, difficulty with attention and concentration, isolative/social anxiety." (Tr. 546). They indicated that the plaintiff was "Not Significantly Limited" in the following: remembering locations and work-like procedures; understanding and remembering very short, simple instructions; carrying out very short, simple instructions; making simple work-related decisions; asking simple questions or requesting assistance; being aware of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independently of others. (Tr. 547–48). They noted that the plaintiff was "Moderately Limited" in understanding and remembering detailed instructions; carrying out detailed instructions; working in coordination with or proximity to others without being distracted by them; interacting appropriately with the general public; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; and traveling in unfamiliar places or using public transportation. (Tr. 547–48). Lastly, they stated that the plaintiff was "Markedly Limited" in maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; accepting instructions and responding appropriately to criticism from supervisors; and getting along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 547–48). The report indicated that the plaintiff's condition had "improved with medication and therapy," but that she was "still minimally functional." (Tr. 549).

On January 14, 2016, Ms. Murray completed another "Medical Opinion Questionnaire," in which she noted that the plaintiff had "Unlimited or Very Good" ability to "[a]dhere to basic standards of neatness and cleanliness." (Tr. 790). She noted that the plaintiff had a "Good" ability to do the following: "[t]ravel in unfamiliar place"; "[r]emember work-like procedures";

"[u]nderstand and remember very short and simple instructions"; "[c]arry out very short and simple instructions"; "[m]aintain attention for two hour segment"; "[m]ake simple work-related decisions"; "[a]sk simple questions or request assistance"; and "[b]e aware of normal hazards and take appropriate precautions." (Tr. 790–91). Ms. Murray indicated that the plaintiff had a "Fair" ability to do the following: "[i]nteract appropriately with the general public"; "[m]aintain socially appropriate behavior"; "[u]se public transportation"; "[m]aintain regular attendance and be punctual within customary, usually strict tolerances"; "[w]ork in coordination with or proximity to others without being unduly distracting"; "[p]erform at a consistent pace without an unreasonable number and length of rest periods"; "[r]espond appropriately to changes in a routine work setting"; "[u]nderstand and remember detailed instructions"; and "[s]et realistic goals or make plans independently of others." (Tr. 790–91). Ms. Murray noted that the plaintiff had "Poor" or no ability to do as follows: "[i]nteract appropriately with the general public"; "[m]aintain socially appropriate behavior"; "[m]aintain regular attendance and be punctual within customary, usually strict tolerances"; "[s]ustain an ordinary routine without special supervision"; "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms"; "[a]ccept instructions and respond appropriately to criticism from supervisors"; "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes"; "[d]eal with normal work stress"; "[c]arry out detailed instructions"; and "[d]eal with stress of semiskilled and skilled work." (Tr. 790–91). Ms. Murray commented also that the plaintiff had "difficulty interacting without angry outbursts" and that she had "poor concentration, inability to interact with men, [and] poor social interactions." (Tr. 792). Ms. Murray opined that the plaintiff's impairments or treatment would cause her to be absent from work "[m]ore than twice a month." (Tr. 792).

3.      DR. NEHA NANDA

The plaintiff received treatment for her HIV diagnosis primarily from Dr. Neha Nanda. Dr. Nanda is a board certified infectious disease specialist. (*See* Pl.'s Mem. at 25 n.2). On August 27, 2015, Dr. Nanda completed a document titled "Medical Opinion RE: Ability to do Physical Activities," on which she noted that the plaintiff's diagnosis was HIV and that her prognosis was "good." (Tr. 639). Dr. Nanda indicated that, as a result of her impairment, the plaintiff could walk about one-half to one city block before she needed to stop and rest, and that the plaintiff could sit and stand continuously for forty-five minutes at one time. (Tr. 639). Dr. Nanda noted also that, in an eight-hour work day, the plaintiff could sit for a total of one hour and "stand/walk" for "about 2 hours." (Tr. 639). Dr. Nanda indicated, however, that the plaintiff did not need a job "which permits shifting positions at will from sitting, standing or walking." (Tr. 639) (emphasis omitted).

In this document, Dr. Nanda opined that if the plaintiff were sitting for a prolonged period of time, her legs should be elevated, and that, during the course of an eight-hour workday, her legs should be elevated ninety percent of the time. (Tr. 640). Moreover, Dr. Nanda noted that the plaintiff should use a "cane or other assistive device" when "engaging in occasional standing/walking," and that the plaintiff can never lift and carry any amount of weight safely during an eight hour workday. (Tr. 640). Dr. Nanda indicated also that the plaintiff had "significant limitations doing repetitive reaching, handling or fingering," but that the plaintiff could "frequently" climb stairs and ladders. (Tr. 641). Dr. Nanda opined that the plaintiff should avoid exposure to extreme cold, extreme heat, high humidity, fumes, odors, dusts, gases, perfumes, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. (Tr. 641). Lastly, Dr. Nanda noted that the plaintiff's impairments were "likely to produce 'good days' and 'bad days,'" and

that, as a result, she would be absent from work "[m]ore than twice a month" on average. (Tr. 641).

### 4.   ACCESS REHAB CENTERS

The plaintiff received physical therapy treatment from Access Rehab Centers ["Access"] from July 27, 2015 through August 24, 2015. (*See* Tr. 622–38). The Access records reflect that the plaintiff complained primarily of lower back pain, explaining that activities such as exercising and cleaning her house increased the pain, but that a "hot shower" would sometimes decrease the pain. (Tr. 623). The plaintiff described the pain as "pinching, grabbing," and rated the pain at a five out of ten at its best, and a nine out of ten at its worst. (Tr. 623). A physical examination revealed that the plaintiff's lumbar range of motion was reduced by twenty-five percent in all directions and that she experienced "lumbar tenderness." (Tr. 624). The examination revealed also that the plaintiff was able to walk on her heels and toes, that her gait pattern was unremarkable, that her mobility was within normal limits, and that a straight leg raising test was negative. (Tr. 624). The Access records show also that the plaintiff had scoliosis with "lumbar S curve" and right "lumbar hump on flexion" (Tr. 623), and that the plaintiff had functional deficits in bending and cleaning. (Tr. 624). In a treatment note from August 24, 2015, the plaintiff's physical therapist noted that the plaintiff reported no back pain, but complained that her left knee was "very bad." (Tr. 630).

### 5.   STATE AGENCY PHYSICIANS

State agency physicians, Dr. Katrin Carlson, Psy.D., Dr. Luis Zuniga, Dr. Khurshid Khan, and Dr. Janine Swanson, Psy.D., reviewed the plaintiff's medical records and opined about whether the plaintiff was disabled. (*See generally* Tr. 90–102, 118–31). Dr. Carlson reviewed the plaintiff's records and completed her report on July 29, 2014. (*See* Tr. 90–102). In her report, Dr.

Carlson concluded that the plaintiff's affective disorders, anxiety-related disorders, and substance abuse disorders were "severe." (Tr. 95).

Dr. Carlson opined that the plaintiff experienced a "mild" restriction of her activities of daily living, and moderate difficulties in "maintaining social functioning" and "maintaining concentration, persistence or pace," but that she did not experience any "[r]epeated episodes of decompensation." (Tr. 95). She opined further that the plaintiff was "[n]ot significantly limited" in the following areas: "[t]he ability to carry our very short and simple instructions"; "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "[t]he ability to sustain an ordinary routine without special supervision"; "[t]he ability to work in coordination with or in proximity to others without being distracted by them"; "[t]he ability to make simple work-related decisions"; "[t]he ability to ask simple questions or request assistance"; "[t]he ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness"; "[t]he ability to travel in unfamiliar places or use public transportation"; and "[t]he ability to set realistic goals or make plans independently of others." (Tr. 98–100).

Dr. Carlson concluded that the plaintiff was "moderately limited" in the following areas: "[t]he ability to carry out detailed instructions"; "[t]he ability to maintain attention and concentration for extended periods"; "[t]he ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; "[t]he ability to accept instructions and respond appropriately to criticism from supervisors"; "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; and "[t]he ability to respond appropriately to changes in the work setting." (Tr. 98–99).

Lastly, Dr. Carlson indicated that the plaintiff was "markedly limited" in the "ability to interact appropriately with the general public." (Tr. 99). Dr. Carlson assessed the plaintiff as having "occasional problems with prolonged [concentration, persistence, or pace] due to anxiety and depression." But she found the plaintiff to be "generally capable of simple [routine, repetitive tasks] for 2 hour periods in [an] 8 hour day." (Tr. 99). Dr. Carlson explained also that the plaintiff "has low frustration tolerance and difficulty communicating effectively due to anger/rage" and, therefore, was "best suited to non-public work settings with lower social demands." (Tr. 99). Additionally, Dr. Carlson opined that the plaintiff had "low frustration tolerance and limits on adaptive capabilities. She [was] able to respond to simple but not detailed changes. [She was] [a]ble to note hazards, set work goals and travel." (Tr. 100).

On July 31, 2014, Dr. Zuniga opined that the plaintiff could "occasionally" lift and/or carry fifty pounds, "frequently" lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight hour workday, and sit for about six hours in an eight hour workday. (Tr. 97). Dr. Zuniga expressed that the plaintiff did not have any limitations pushing and/or pulling, and that the plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 97–98).

On November 10, 2014, Dr. Swanson reviewed the plaintiff's records and submitted her report. (*See* Tr. 118–31). She concluded that the plaintiff suffered from affective disorders, anxiety-related disorders, and substance addiction disorders; she found that these disorders were "severe." (Tr. 123). She found that the plaintiff experienced a "moderate" restriction of her activities of daily living, and "moderate" difficulties maintaining social functioning and maintaining concentration, persistence or pace, but that she did not experience any "[r]epeated episodes of decompensation." (Tr. 124).

Dr. Swanson determined that the plaintiff was "not significantly limited" in the following areas: "[t]he ability to carry out very short and simple instructions"; "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "[t]he ability to sustain an ordinary routine without special supervision"; "[t]he ability to work in coordination with or in proximity to others without being distracted by them"; "[t]he ability to make simple work-related decisions"; "[t]he ability to interact appropriately with the general public"; "[t]he ability to ask simple questions or request assistance"; "[t]he ability to accept instructions and respond appropriately to criticism from supervisors"; "[t]he ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness"; "[t]he ability to be aware of normal hazards and take appropriate precautions"; and "[t]he ability to travel in unfamiliar places and use public transportation." (Tr. 127–28).

Dr. Swanson found that the plaintiff was "moderately limited" in the following areas: "[t]he ability to carry out detailed instructions"; "[t]he ability to maintain attention and concentration for extended periods"; "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; "[t]he ability to respond appropriately to changes in the work setting"; and "[t]he ability to set realistic goals or make plans independently of others." (Tr. 127–28). Dr. Swanson did not find that the plaintiff was "markedly limited" in any way. (*See* Tr. 127–28). She noted that the plaintiff was "able to attend to simple tasks for at least two hours at a time, but secondary to anxiety and depressive symptoms would not be able to sustain concentration on complex tasks for more than a very brief period." (Tr. 127–28). Dr. Swanson continued that the plaintiff was "also likely to demonstrate some cognitive

slowing indicative of depression, which would make it difficult for [her] to perform adequately in a fast paced, competitive environment. Thus, secondary to reduced concentration and pace, [the plaintiff would] . . . be able to perform simple, routine, repetitive tasks in a setting that does not require strict adherence to time or production quotas." (Tr. 128). Dr. Swanson stated that that the plaintiff would "do best in a non-public work [environment], where contact with others is superficial and infrequent and the need for collaboration is not required," and that she "would likely have difficulty adapting to [a] rapidly changing work environment, and would have difficulty establishing realistic goals for herself. Thus, she would benefit from working in an environment that changes minimally from day to day, and from having daily concrete goals set for her." (Tr. 128).

On November 4, 2014, Dr. Khan reviewed the plaintiff's records and determined that the plaintiff could "occasionally" lift and/or carry fifty pounds, and that she could "frequently" lift and/or carry twenty-five pounds. (Tr. 126). Dr. Khan added that the plaintiff could stand and/or walk for about six hours in an eight-hour workday, and that she could sit for about six hours in an eight-hour workday. (Tr. 126). Finally, Dr. Khan concluded that the plaintiff had no limitations pushing and/or pulling, and that the plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 126).

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[9] the ALJ found that the plaintiff's date last insured for purposes of SSDI was December 31, 2013[10] (Tr. 24, 25), and that she has not engaged in substantial gainful activity since February 1, 2009, her alleged onset date of disability.  (Tr. 26, citing 20 C.F.R. §§ 404.1571, *et seq.* and 416.971, *et seq.*).  At step two, the ALJ concluded that the plaintiff has the following severe impairments: depression, anxiety, Hepatitis C and chronic liver disease, HIV, degenerative disc disease of the lumbar spine, degenerative arthritis in the left knee, and substance abuse.  (Tr. 26, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).  At step three, the ALJ found that the plaintiff does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 26–27, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925, and 404.926).  The ALJ concluded that the plaintiff has the residual functional capacity

---

[9] An ALJ determines disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a).  If the claimant is currently employed, the claim is denied.  *Id.*  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998).  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv).  If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[10] A claimant's date last insured applies only to claims for SSDI, not SSI.  *See McLellan v. Astrue*, No. 3:12-CV-1657 (DFM), 2016 WL 4126414, at *1 n.1 (D. Conn. Aug. 3, 2016); *Severino v. Astrue*, No. 3:07-CV-1347 (WIG), 2008 WL 3891956, at *1 (D. Conn. June 20, 2008), Magistrate Judge's Recommended Ruling approved and adopted, No. 3:07-CV-1347 (MRK) (D. Conn. July 11, 2008).  Accordingly, reference to the plaintiff's date last insured of December 31, 2013 is applicable only to her claim for SSDI.  The relevant time period for the plaintiff's claims for SSI is the date on which she filed her application for SSI through the date of the ALJ's decision.  *See Stergue v. Astrue*, No. 3:13-CV-25 (DFM), 2014 WL 12825146, at *2 (D. Conn. May 30, 2014) (citing *Pratt v. Astrue*, No. 3:10-CV-413 (CFD), 2011 WL 322823, at *3 (D. Conn. Jan. 28, 2011)).

["RFC"] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that the plaintiff is limited to simple, routine, and repetitive tasks not at any production-rate pace; little or no contact with coworkers, and no requirement for any collaborative efforts; no public contact; and few changes in the workday from day-to-day. (Tr. 28). At step four, the ALJ determined that the plaintiff is unable to perform her past relevant work. (Tr. 33, citing 20 C.F.R. §§ 404.1565 and 416.965). Finally, after considering the plaintiff's RFC, age, education, and work experience, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that the plaintiff could perform. (Tr. 33, citing 20 C.F.R. §§ 404.1569(a), 404.969, and 404.969(a)). Specifically, the ALJ determined that the plaintiff would be able to perform the jobs of a mail clerk, a marker, and a routing clerk. (Tr. 34). Accordingly, the ALJ concluded that the plaintiff was not "under a disability, as defined in the Social Security Act, from February 1, 2009, through the date of this decision." (Tr. 34, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). Second, the court must decide whether substantial evidence supports the determination. *Id.* The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d

106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## V.    DISCUSSION

Here, the plaintiff contends that the ALJ afforded improper weight to the plaintiff's treating physicians and other medical sources. (Pl.'s Mem. at 18–30). Specifically, the plaintiff argues that the ALJ afforded improper weight to the opinions of Dr. Battista and Ms. Murray (Pl.'s Mem. at 19–24), Dr. Nanda (Pl.'s Mem. at 24–25), Dr. Krosi (Pl.'s Mem. at 25–27), and DDS experts Dr. Carlson and Dr. Swanson. (Pl.'s Mem. at 27–30). Additionally, the plaintiff maintains that substantial evidence does not support the ALJ's RFC determination. (Pl.'s Mem. 30–36). Specifically, the plaintiff argues that the ALJ's RFC determination does not address adequately findings of the plaintiff's off-task behavior and absenteeism (Pl.'s Mem. at 31–33), the need for limited interaction with supervisors (Pl.'s Mem. at 33–34), and additional limitations that would preclude the plaintiff from performing light exertion work. (Pl.'s Mem. 34–36). The defendant

responds that substantial evidence supports the ALJ's evaluation of the medical evidence and the RFC determination. (Def.'s Mem. at 4–16). The Court agrees with the defendant.

A.    THE ALJ PROPERLY APPLIED THE TREATING PHYSICIAN RULE

The plaintiff claims that the ALJ erred by failing to give the opinions of her treating physicians and the State agency consultants "significant or controlling weight." (*See* Pl.'s Mem. at 19; *see generally* Pl.'s Mem. at 18–30). Specifically, the plaintiff argues that "[t]he 'treating physician rule' requires that in all cases, the treating physician's opinion must be given substantial deference." (Pl.'s Mem. at 19, citing *Arnone v. Bowen*, 882 F.2d 34, 41 (2d Cir. 1989); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983); *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir. 1999); *Ruiz v. Apfel*, 98 F. Supp. 2d 200 (D. Conn. 1999)). The defendant responds that "[t]he ALJ identified valid reasons under the [defendant's] regulations to discount the various opinions" of the plaintiff's treating physicians and the State agency consultants. (Def.'s Mem. at 7; *see generally*, Def.'s Mem. at 7–15).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]); *see* 20 C.F.R. § 416.927(c)(2). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has

considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

### 1.    OPINIONS OF DR. BATTISTA AND MS. MURRAY

The ALJ explained that he afforded "little weight" to Dr. Battista's opinions because "Dr. Battista did not explain or justify his opinions by providing objective medical evidence of the limitations asserted.  Rather, Dr. Battista simply checked boxes on a piece of paper."  (Tr. 31). The ALJ added that Dr. Battista's opinions "are also given little weight because they are inconsistent with the record . . . ."  (Tr. 31).  Similarly, the ALJ afforded "little weight" to Ms. Murray's opinions because "Ms. Murray did not provide any objective medical evidence supporting her opinions; she simply checked boxes on a piece of paper," and because her opinions were "inconsistent with the record."  (Tr. 32).  The plaintiff argues that, regardless of form, Dr. Battista's and Ms. Murray's opinions are "entitled to weight" (Pl.'s Mem. at 22), and that "[i]t is disingenuous for the ALJ to reject treating physician opinions because they were completed on a check-list style form, that was created and supplied by the [SSA]."[11] (Pl.'s Mem. at 23).  The Court disagrees.

---

[11] The Court notes that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).  "[W]here these so-called 'reports are unaccompanied by thorough written reports, their reliability is suspect . . . .'" *Id.*  The Second Circuit has shared in the skepticism of check-box or fill in the blank forms that are unaccompanied by written reports or other objective medical evidence. *See, e.g.*, *Halloran*, 362 F.3d at 31 n.2 (characterizing as "only marginally useful" a multiple choice form from the New York State Office of Temporary and Disability Assistance); *but see Camille v. Colvin*, 625 F. App'x 25, 28 (2d Cir. 2016) (summary order) (concluding that the ALJ did not err in weighing the opinions of a state agency consulting psychologist because, *inter alia*, "his check-box opinions were supplemented by narrative explanation" (citing 20 C.F.R. § 404-1527(c)(3)-(6))).

The minimal objective medical evidence in the record does not support the ratings that Dr. Battista and Ms. Murray provided. In June 2014, Dr. Battista and Ms. Murray opined that the plaintiff was able to manage her activities of daily living (Tr. 503), and, in a "progress note" from June 3, 2015, Dr. Battista indicated that the plaintiff was "less anxious, less irritable," and that her "depression [was] under better control." (Tr. 723). On July 20, 2015, Ms. Murray noted that the plaintiff was "hoping to return to school," and that she had made "[g]ood [p]rogress." (Tr. 725). Additionally, on May 7, 2014, Dr. Battista noted that the plaintiff's "[d]epression and insomnia [were] well controlled," and that "PTSD symptoms [were] also well controlled." (Tr. 754). On October 8, 2014, Dr. Battista noted that the plaintiff developed "[p]roblems with attention, concentration, and learning after she was molested," and that the plaintiff's hyperactivity as a child was "suggestive of a possible underlying attention deficit disorder" (Tr. 754, 755); however, Dr. Battista did not indicate whether or how the plaintiff's difficulties with attention and concentration impacted her currently. The objective evidence in the record indicates that the plaintiff was making good progress overall and that she experienced, at most, moderate depression symptoms.

Dr. Battista's and Ms. Murray's ratings are also inconsistent with the other medical evidence in the record. For instance, in October 2012, the plaintiff underwent a standardized depression screening, which revealed that the plaintiff had "no significant symptoms." (Tr. 408). Additionally, in a May 2014 visit note, Dr. Krosi indicated that the plaintiff was seeing Dr. Battista and "doing much better" (Tr. 367); and in a February 20, 2014 visit note, Dr. Krosi included that a standardized depression screening revealed "mild to moderate symptoms." (Tr. 375). The record does not indicate that the plaintiff suffered from the numerous marked limitations that Dr. Battista and Ms. Murray checked on the multiple choice/check-box forms.

It bears note that most of the records on which Dr. Battista and Ms. Murray recorded their assessments of the plaintiff are, in fact, multiple choice or check-box forms. (See Tr. 502–505, 541–50, 790–93). For example, on one form, Dr. Battista and Ms. Murray rated on a one through five scale how much of a problem the plaintiff had with activities of daily living, social interactions, and task performance. (Tr. 503–04). Another form required Dr. Battista and Ms. Murray to choose whether the plaintiff showed "No Evidence of Limitation," or was "Not Significantly Limited," "Moderately Limited," or "Markedly Limited" in a number of categories. Although these forms provide an indication of where Dr. Battista and Ms. Murray rated the plaintiff's limitations and abilities, there is no objective medical evidence in the record to supplement or support the ratings that Dr. Battista and Ms. Murray reached.

Furthermore, Dr. Battista's and Ms. Murray's opinions are inconsistent with the plaintiff's own testimony and indications about her activities of daily living. The plaintiff testified that she cleaned her apartment as a hobby, and that she took at least one day each week to clean and do chores. (Tr. 83, 290, 294). The plaintiff added that she cooked for herself multiple times each week, often preparing home-cooked meals that took approximately one half-hour to make. (Tr. 82, 291). The plaintiff watched hour-long television shows and was able to explain to others what occurred on the show. (Tr. 76, 82, 293). Importantly, the plaintiff testified that she cared for her grandson, who came to her house every day and would often spend the night or the entire weekend. (Tr. 75, 77–78). She added that she read to her grandson and played with him. (Tr. 75, 76). Such testimony is inconsistent with the answers that Dr. Battista and Ms. Murray provided on the multiple choice/check-box forms. Accordingly, the ALJ properly afforded "little weight" to the opinions of Dr. Battista and Ms. Murray.

## 2. OPINION OF DR. KROSI

The plaintiff argues similarly that the ALJ afforded improper weight to Dr. Krosi. The ALJ afforded "little weight" to Dr. Krosi's opinion that the plaintiff "has a marked limitation in maintaining social functions, and that the [plaintiff] has a marked limitation[] with concentration, persistence, or pace." (Tr. 32). The ALJ reasoned that "Dr. Krosi did not explain why the [plaintiff] has these limitations or provide objective examples of the limitations asserted. Dr. Krosi simply checked boxes on a piece of paper." (Tr. 32). The ALJ added that "this [opinion] is given little weight because it is grossly inconsistent with the record. As already explained, the [plaintiff] is in a committed relationship, cares for her grandson, earned a certificate in business, and regularly watches the news." (Tr. 32). The plaintiff reasserts her argument that the opinions of a treating physician are "entitled to more weight than the opinion of any other examining or non-examining physician, and [are] entitled to 'controlling weight' 'if it is well supported by medical findings and not inconsistent with other substantial record evidence.'" (Pl.'s Mem. 26). The defendant responds that the ALJ's rationale for affording little weight to Dr. Krosi's opinion "largely tracks the ALJ's rationale with respect to Dr. Battista's opinions, and is equally valid under the Commissioner's regulations and the record in this case." (Def.'s Mem. at 14). The Court agrees with the defendant.

There is no written report or other objective medical evidence supporting the check-box form on which Dr. Krosi indicated that the plaintiff suffered from "marked limitation in maintaining social functioning" and "marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." (*See* Tr. 538). Moreover, the medical evidence in the record does not support Dr. Krosi's findings in this regard. For example, on May 5, 2014, Dr. Krosi noted that the plaintiff "sees Dr. Battista and therapist once a week," and "states

that she is doing much better." (Tr. 367). Additionally, on March 20, 2014, Dr. Krosi noted that the plaintiff was "[n]ot feeling poorly (malaise)" (Tr. 368), and in February 2014, reported that a standardized depression screening revealed "mild to moderate symptoms" (Tr. 375). There are instances in Dr. Krosi's records where she notes generally the plaintiff's depression. (*See* Tr. 365, 367, 371, 373, 375, 377, 383, 402, 405). The only objective medical evidence in Dr. Krosi's records regarding the plaintiff's depression, however, is the following: two standardized depression screenings, one from February 20, 2014 that notes "mild to moderate symptoms" (Tr. 375), and one from October 18, 2012 that notes "no significant symptoms" (Tr. 408); and one record from January 31, 2013 that notes "[d]epression mild." (Tr. 399).[12] Dr. Krosi's treatment notes, therefore, do not support her answers on the check-box form that she completed.[13]

Moreover, Dr. Krosi's opinion is also inconsistent with the plaintiff's own testimony. As detailed above, the plaintiff testified that one of her hobbies was cleaning her apartment, and that she did chores for at least one full day each week. (Tr. 83, 290, 294). The plaintiff indicated that she prepared home-cooked meals for herself approximately twice each week, which took about thirty minutes to make. (Tr. 82, 291). Also, the plaintiff watched television shows that lasted for one hour and was able to explain to others what occurred on the show. (Tr. 76, 82, 293). The plaintiff testified that she cared for her grandson, and that he came to her house every day and often spent the night or the entire weekend. (Tr. 75, 77–78). Additionally, she read to her grandson and played with him when he was with her. (Tr. 75, 76). The medical evidence in the record and the plaintiff's own testimony do not indicate that the plaintiff experienced the "marked limitations"

---

[12] Notably, on several occasions Dr. Krosi pointed out that the plaintiff was "[n]ot taking medication for depression." (*See* Tr. 371, 377, 383, 397, 402, 405). The record reveals, however, that the plaintiff's condition had "improved with medication and therapy." (Tr. 549).

[13] Dr. Krosi's answers on the check-box form are also inconsistent with other medical evidence in the record, such as the opinion of the State agency consultants that the plaintiff has the ability to "maintain socially appropriate behavior." (Tr. 98–100, 127–28).

from which Dr. Krosi opined the plaintiff suffered. Accordingly, the ALJ weighed properly the opinion of Dr. Krosi.

3.    OPINION OF DR. NANDA

The plaintiff claims that it was improper for the ALJ to afford "little weight" to Dr. Nanda's opinion that the plaintiff "is severely restricted in performing work-related activities such as lifting, sitting, standing, and fingering." (Tr. 31). The ALJ explained that he afforded "little weight" to this opinion because Dr. Nanda "did not explain or justify the opinions expressed by providing objective medical evidence of the limitations asserted. Rather, Dr. Nanda simply checked boxes on a piece of paper." (Tr. 31). The ALJ added that "[f]urthermore, this opinion is given little weight because Dr. Nanda was discussing physical limitations caused by the [plaintiff's] HIV status. However, the record shows that the plaintiff is asymptomatic with regard to HIV" (Tr. 31), and that "this opinion is also given little weight because it is inconsistent with the evidence in the record." (Tr. 31). The plaintiff argues that "Dr. Nanda is a Board Certified Infectious Disease specialist," that "[c]ertainly, Dr. Nanda has the expertise to understand, and opine about [the plaintiff's] HIV status and how it affects her ability to function," and that "Dr. Nanda's opinion is entitled to significant, if not controlling weight." (Pl.'s Mem. at 25). The defendant responds that the ALJ's rationale for affording little weight to Dr. Nanda's opinion "largely tracks the ALJ's rationale with respect to Dr. Battista's opinions, and is equally valid under the Commissioner's regulations and the record in this case." (Def.'s Mem. at 14). The Court agrees with the defendant.

The objective medical evidence in the record does not support Dr. Nanda's opinion. For example, the plaintiff's May 5, 2014 visit note from Dr. Krosi indicates that the plaintiff complained of only "[b]ody aches" (Tr. 365), and on February 20, 2014, the plaintiff complained that "she has body aches, and is too tired to work, it is difficult for her to stand too long or sit for

too long. States her joints ache" (Tr. 371). A physical examination of the plaintiff on February 20, 2014, revealed "[c]ompression arthralgia of multiple sites: possibly related to hep C." (Tr. 373). Additionally, following a physical examination on October 2, 2013, Dr. Krosi noted "HIV infection: stable. No treatment." (Tr. 385). A review of the plaintiff's musculoskeletal system on October 1, 2012 revealed that the plaintiff had "No muscle aches." (Tr. 412). Moreover, there is nothing in the record to support the opinion that the plaintiff's legs should be elevated ninety percent of the day (Tr. 640), or that the plaintiff could not use her hands, fingers, or arms for any percentage of an eight-hour workday. (Tr. 640).

Additionally, as it does for the other treatment providers, the plaintiff's testimony conflicts with Dr. Nanda's opinion. The plaintiff testified that she could sit for about two to three hours before she started experiencing pain (Tr. 81), and that she could stand for about two to three hours before she needed to sit back down because of pain and swelling in her feet (Tr. 81). This testimony is inconsistent with Dr. Nanda's indication that the plaintiff could sit and/or stand continuously for only forty-five minutes. (Tr. 639). The plaintiff testified also that she could lift a full gallon of milk with two hands (Tr. 81), which is inconsistent with Dr. Nanda's opinion that the plaintiff could never safely lift and/or carry even less than ten pounds during an eight-hour day (Tr. 640). The plaintiff indicated that she could walk approximately two blocks before she had to stop and rest (Tr. 295), which is inconsistent with Dr. Nanda's conclusion that the plaintiff could walk only one-half to one city block without rest. (Tr. 639). Accordingly, the ALJ properly afforded "little weight" to Dr. Nanda's opinion.

## 4. OPINIONS OF THE STATE AGENCY CONSULTANTS

The plaintiff argues that the ALJ afforded improper weight to the opinions of the State agency consulting psychologists.[14] The ALJ afforded "partial weight" to the opinions of Dr. Carlson and Dr. Swanson, reasoning:

> Dr. Carlson opined that the [plaintiff] had mild restrictions with activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. . . . This is consistent with the record, which shows that the [plaintiff] regularly cleans, has a committed long-term relationship as well as cares for her family, and completed a business certificate program. This opinion was also largely shared by Dr. Swanson. . . . However, Dr. [Swanson[15]] also opined that the [plaintiff] has moderate restrictions on activities of daily living . . . . This opinion is inconsistent with the record. The [plaintiff] testified that she sees her grandson every day when she does not feel physical pain. The [plaintiff] is also able to prepare food, bathe and groom herself, and care for at least one pet.

(Tr. 31) (citations omitted & footnote added). The plaintiff argues that the ALJ afforded insufficient weight to the opinions of Dr. Carlson and Dr. Swanson because "[t]he state agency physicians here did describe large numbers of at least moderate limitations, which when taken together would significantly erode [the plaintiff's] occupational base."[16] (Pl.'s Mem. at 29). The defendant responds that "[n]o such 'moderate limitations' exist in these doctors' opinions; Plaintiff confuses a series of 'questions [which] help determine the individual's ability to perform sustained work activities' with the doctors' actual opinions, which they are not." (Def.'s Mem. at 9).

---

[14] The plaintiff does not challenge the weight afforded to the opinions of Dr. Zuniga or Dr. Khan.

[15] In his decision, the ALJ indicated incorrectly that it was Dr. Carlson who opined that the plaintiff experienced "moderate" restrictions in her activities of daily living. (*See* Tr. 31). However, the ALJ cited to the report submitted by Dr. Swanson to support that assertion. (*See* Tr. 31). After carefully reviewing the record and the ALJ's decision, it is apparent that the ALJ's reference should have been to Dr. Swanson, not Dr. Carlson.

[16] The plaintiff argues also that "[i]t is unclear whether the ALJ intended to write 'this is inconsistent with the record' instead of '[t]his is consistent with the record' when discussing Dr. Carlson's opinion that the plaintiff has mild difficulties with her activities of daily living, and moderate difficulties with maintaining social functioning and maintaining concentration, persistence, or pace." (Pl.'s Mem. at 29). When the phrase is put into context, it is apparent that the ALJ intended the phrase to be as written.

The Second Circuit has recognized that "[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source." *Schiesler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993). The opinions of non-examining sources, however, may "override treating sources' opinions, provided they are supported by evidence in the record." *Id.* (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)).

Here, the ALJ properly rejected Dr. Swanson's opinion that the plaintiff experienced "moderate restrictions on activities of daily living." (Tr. 31). Although the plaintiff experienced some restrictions due to her depression and post-traumatic stress disorder, the evidence in the record does not support the conclusion that these were "moderate" restrictions. For example, in June 2014, Dr. Battista and Ms. Murray opined that the plaintiff was able to manage her activities of daily living (Tr. 503), and the plaintiff indicated to Ms. Murray on July 20, 2015 that she was hoping to go back to school. (Tr. 725). Additionally, the plaintiff testified that, while she was in prison, she obtained a business certification, which required her to take classes. (Tr. 66). The plaintiff indicated that she watches hour-long television shows, and that she can explain to others what occurred on the show. (Tr. 82, 295). Moreover, the plaintiff testified that she cared for her grandson, often keeping him overnight or for the entire weekend. (Tr. 75–78). The plaintiff explained that she talks to her children frequently, even though she does not always get along with them. (Tr. 296). The record reveals that the plaintiff has had the same partner for several years (Tr. 397, 402, 405, 409, 411, 417, 420, 424, 432, 435, 440; *see also* Tr. 365, 372, 377, 383, 388); Dr. Battista and Ms. Murray indicated on April 2, 2014 that the plaintiff's relationship with her partner was improved. (Tr. 819). Lastly, the record shows that the plaintiff never experienced repeated episodes of decompensation. (Tr. 95, 124). Accordingly, the ALJ properly discredited

Dr. Swanson's opinion that the plaintiff experienced a "moderate" restriction in her activities of daily living and afforded "partial weight" to the opinions of Dr. Carlson and Dr. Swanson.

B.   SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S RFC
     DETERMINATION

The plaintiff argues that the ALJ's RFC determination "lack impairments as described by plaintiff and treating sources and agency physicians." (Pl.'s Mem. at 30). The ALJ concluded:

> the [plaintiff] has the residual functional capacity to perform light work . . . except that the [plaintiff] is limited to simple, routine, and repetitive tasks—not at any production rate pace; little or no contact with coworkers, and no requirement for any collaborative efforts; no public contact; few changes in the workday from day-to-day.

(Tr. 28). The plaintiff argues that her "medical doctors described limitations that would preclude light exertion work" and, therefore, "[t]he ALJ should have included these limitations in his RFC determination." (Pl.'s Mem. at 35). The defendant responds that "the ALJ set forth a clear basis for his mental RFC finding, which, in addition to the medical opinions cited above, is also supported by Plaintiff's testimony, treatment history, and daily activities as outlined in the ALJ's decision." (Def.'s Mem. at 10).

Residual functional capacity is defined as "the most [a claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1); *see also Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order). The Commissioner assesses a claimant's residual functional capacity "based on all the relevant medical and other evidence" in the record, which includes the plaintiff's subjective complaints. 20 C.F.R. § 404.1545(a)(1); *see also Barry*, 606 F. App'x 622 n.1. The ALJ's RFC determination need not "perfectly correspond with any of the opinions of medical sources cited in his decision[;] [an ALJ is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) (citing *Richardson v. Perales*, 402 U.S. 389,

399 (1971); *see Pinsky v. Berryhill*, No. 17-CV-524 (MPS), 2018 WL 3054672, at *10 (D. Conn. June 20, 2018).

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls." *Id.* "This court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry*, 606 F. App'x 622 n.1, *citing* 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, substantial evidence supports the ALJ's RFC determination. Dr. Krosi indicated that the plaintiff had full range of motion in her knees in June 2009 (Tr. 468), and that she had full range of motion and normal mobility in her hips in December 2009. (Tr. 454). An August 2010 MRI revealed that the plaintiff had "moderate spondylotic changes" and "moderate dextroscoliosis" (Tr. 352); however in December 2010, the plaintiff reported no musculoskeletal symptoms. (Tr. 433). Additionally, the record indicates that in November 2014, an examination of the plaintiff revealed "no localized joint pain" (Tr. 745), and that, in July 2015, an x-ray showed the plaintiff to have mild degenerative arthritis in her left knee. (Tr. 591). The plaintiff's records from Access indicate that, although the plaintiff's range of motion was decreased by twenty-five percent in all directions, she was able to walk on her heels and toes, her mobility was within normal limits, her gait pattern was unremarkable, and a straight leg raising test was negative. (Tr. 624).

Moreover, the record reflects that, in June 2009, the plaintiff declined a prescription for an antidepressant and a referral for mental health treatment despite her complaints of depression. (Tr. 466). In October 2012, the plaintiff reported loss of pleasure, loss of interest in activities, and

instances of feeling down (Tr. 405); however, the record reflects that the plaintiff was doing "much better" after starting mental health treatment. (Tr. 365, 773, 775). The record reflects also that, in November 2014, the plaintiff had "no depression, no anxiety, [and] no sleep disturbances." (Tr. 745). Dr. Battista's notes indicate that the plaintiff's depression had been "on and off for years" (Tr. 723, 754), but that the plaintiff was making "good clinical improvement" as of April 2015. (Tr. 819). The record shows also that, with medication and therapy, the plaintiff's condition improved (Tr. 549), and that the plaintiff had no repeated episodes of decompensation. (Tr. 95).

The records from the state agency psychological consultants, to whom the ALJ afforded partial credit, reveal that the plaintiff experiences "low frustration tolerance," and that the plaintiff is best suited for "non-public" work in an environment with "lower social demands." (Tr. 99). The State consultants' records indicate also that the plaintiff experienced a "mild" restriction of her activities of daily living, and moderate difficulties in "maintaining social functioning" and "maintaining concentration, persistence or pace." (Tr. 95). The State psychological consultants' records reflect that the plaintiff should work in an environment that does not require, *inter alia*, collaboration with coworkers, strict adherence to time or production quotas, or substantial change from day to day. (*See* Tr. 99–100, 128; *see also* section II.B.5. *supra*). The consultant records reveal that the plaintiff did not experience any "[r]epeated episodes of decompensation" (Tr. 95), and that she could typically focus for periods of two hours. (Tr. 127–28).

Furthermore, the plaintiff testified that she could sit for approximately two to three hours before she began to experience pain (Tr. 81), and that she could stand for two to three hours before her feet would swell and she began to experience pain. (Tr. 81). She testified also that she cleaned her apartment often, and that if she experienced pain while cleaning, she would "suck it up." (Tr. 83–84). The plaintiff explained that she saw and cared for her grandson almost every day, during

which time she read to him and played with him. (Tr. 75–76). The plaintiff noted that she forced herself to walk every day and could walk about two blocks before she needed to stop and rest. (Tr. 81, 295). She also testified that she could relay to someone what occurred on a television show such as *Criminal Minds*, which lasted for one hour, and follow written instructions. (Tr. 82, 295).

The ALJ's RFC determination accounts for the restrictions and limitations about which the medical sources and the plaintiff opined, and also aligns with the hypothetical individual posed to the vocational expert, whom the vocational expert opined would be capable of performing three jobs that exist in significant numbers in the national economy. Even though the ALJ's RFC determination does not "perfectly correspond" with the opinions of the medical sources in the record, it is clear that it accounts for all of the evidence in, and is consistent with, the record as a whole.[17] *See Matta v. Astrue*, 508 F. App'x at 56. Accordingly, substantial evidence supports the ALJ's RFC determination.

VI. <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is DENIED, and the defendant's Motion to Affirm (Doc. No. 17) is GRANTED.

Dated this 12th day of December, 2018 at New Haven, Connecticut.

/s/ Robert M. Spector, USMJ_____
Robert M. Spector
United States Magistrate Judge

---

[17] The plaintiff argues that the ALJ selectively relied upon evidence in the record to support his conclusion that the plaintiff is not disabled. (*See* Pl.'s Mem. at 29–30). It is well established, however, that an ALJ "need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision." *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (per curiam).